### Haut v. Franklin Life Insurance Company, Appellant.

Argued September 28, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Paul A. Manion,* with him *Reed, Smith, Shaw & Mc-Clay,* for appellant.

*Carl Brandt,* with him *J. Howard Womsley,* and *Brandt, Riester, Brandt & Malone,* for appellee.

OPINION BY MR. JUSTICE EAGEN, May 21, 1968:

This is an appeal by the Franklin Life Insurance Company (Company) from a judgment entered against it on a jury verdict in favor of Caroline C. Haut in the amount of $12,490. The dispute involves the proper construction of a policy of life insurance and the proper actuarial computations under that policy.

Raymond C. Haut (Haut) purchased from the Company a life insurance policy with a principal sum of $10,000. The policy called for premium payments for twenty years with the first policy year beginning on June 24, 1959. Pursuant to an election offered by the Company, Haut decided to pay premiums monthly. It is agreed by all that the monthly premium required to be paid was $45.80 and that each premium payment, to be made on the 24th of each month, was to cover the period beginning on the date payment was due and ending on the 24th day of the following month.

Haut paid the monthly premiums until October 24, 1960, one year and four months after the policy was issued. He did not pay the premium due on that date. However, the policy contained an automatic premium loan provision which stated as follows: *"Automatic Premium Loan:* If proper written request for the operation of this provision has been received at the Home Office of the Company before default in payment of any premium or within the grace period, any premium due on this Policy remaining unpaid on the last day of grace for payment of same will be advanced by the Company, provided the cash value of this Policy at the end of the period which such premium would cover exceeds the total indebtedness to the Company hereon by an amount sufficient to pay such premium with interest thereon. The amount of such advanced premium with interest thereon at the rate of 5% per annum to the next succeeding anniversary of this Policy shall constitute a loan against this Policy and thereafter such loan shall bear interest at the rate of 5% per annum payable in advance. If such interest is not paid when due it shall be added to such loan and bear interest at the same rate. If the cash value of this Policy at the end of any period for which a premium is due and unpaid does not exceed the total indebtedness hereon

by an amount sufficient to pay such premium with interest thereon, then such due and unpaid premium shall not be advanced as a loan but the provisions of this Policy entitled 'Non-Forfeiture' shall apply. The Company shall have a prior lien on this Policy and its proceeds for any loans made hereunder together with interest thereon. At any time before default in payment of premium, the payment of premiums in cash to the Company may be resumed in accordance with the provisions of this Policy. The request for the operation of this provision may be revoked at any time by proper written request to the Company at its Home Office, provided, however, that such revocation shall not affect any loan which may have been previously made hereunder."

Haut had requested operation of this provision; and the Company having determined that there would be sufficient cash value in the policy on November 24, 1960 (the last day of the period which the premium would cover) to cover the resulting indebtedness to the Company, advanced the monthly premium.

On November 24, 1960, Haut again failed to pay the monthly premium then due. The Company determined that there would not be sufficient cash value on December 24, 1960, to cover the advance of this November 24th premium and, in accordance with the above-quoted provision, applied the nonforfeiture provisions of the policy. The remaining cash value was used to purchase paid-up extended term insurance for the principal amount of the policy. It is agreed, if the Company's computations are correct, that this insurance expired on April 8, 1961.

Raymond Haut died on April 13, 1961. His widow (plaintiff), primary beneficiary under the policy, brought this suit to recover the face amount of the policy plus interest from the date of death. According to plaintiff, a correct computation of the remaining

cash value at the time of default would have resulted in there being sufficient cash value to purchase paid-up extended term insurance through April 14, 1961, one day after Haut's death. It is agreed that if plaintiff's computations are correct, this would be the expiration date.

The problem thus centers upon certain computations of cash value. Before reviewing the varying contentions of the parties, however, other provisions of the policy which bear upon the problem must be mentioned.

First, the policy contained a somewhat unusual feature referred to as a "guaranteed coupons" benefit. This feature of the policy provided an additional policy benefit in accordance with the following provision:

"GUARANTEED COUPONS

"While this Policy is kept in force by 'the payment of premiums in cash the Insured may select one of the following options: OPTION A. Surrender any matured coupon to the Company on any premium due date in reduction of the premium then due; or OPTION B. Surrender any matured coupon to the Company for its cash value; or OPTION C. Surrender any coupon to the Company within thirty-one days after its maturity for a participating paid-up addition to this Policy in accordance with the schedule of coupons attached hereto.

"Unused matured coupons, unless previously applied in accordance with the Non-Forfeiture Provision hereof, shall be accumulated prior to the end of the twentieth policy year at 3% per annum compound interest for each full year after due dates thereof. Such accumulated amount shall be payable in cash on surrender of such coupons to the Company or, in the event of the death of the Insured, said amount shall be payable to the Beneficiary or Beneficiaries hereunder.

. . .

"Subject to the provisions of Policy No. 1842675 and upon the payment of 2nd annual premium in full and not otherwise,

"THE FRANKLIN LIFE INSURANCE COMPANY will pay to the order of the Insured under said Policy $59.60 or upon written request of the Insured within thirty-one days after said date will apply said sum to the purchase of a paid-up life addition of $160.00."

Second, the cash value provision of the policy was as follows: *"Basis of Cash Value:* The cash value at the end of any policy year is computed as the excess of the then present value of the life insurance benefits (including unmatured coupons) provided by this Policy, assuming all death claims payable at the end of the policy year of death, over the then present value of an annual amount for the remaining period during which premiums are payable under this Policy, all on the basis of the Commissioners 1941 Standard Ordinary Mortality Table with interest at the rate of 3% per annum, which annual amount is equal to the net level premium applicable to this Policy on said basis, multiplied by the non-forfeiture factor which is set forth in the Table of Non-Forfeiture Factors below. Such excess shall be increased by the present value of any coupon and dividend additions and any coupon and dividend accumulations and shall be decreased by any indebtedness to the Company hereon. If such cash value exceeds the net single premium required to provide paid-up insurance for the principal sum insured, the excess of such cash value shall be paid to the Insured. The net value of any coupon and dividend additions shall be not less than the amount used to purchase such additions. The life insurance benefits specified herein shall not include (a) any provision for total and permanent disability or for additional benefits, if any, for death by accidental means, or,

236

(b) any decreasing term insurance benefits provided by a rider attached to and forming a part of this Policy."

Finally, the following provision setting forth the basis for loan and nonforfeiture values is pertinent: *"Explanation of Table of Non-Forfeiture and Loan Values*: The values shown in the Table of Non-Forfeiture and Loan Values hereof are for completed policy years and are computed on the assumption that the policy has been in force and premiums duly paid for the number of years stated, and that there are no paid-up additions or coupon and dividend accumulations credited to this Policy and that there is no indebtedness to the Company hereof. The tabular amounts of paid-up and extended insurance are equal in value to the corresponding cash values. If the premiums on this Policy shall be paid other than annually, due allowance will be made in computing cash and non-forfeiture values for that portion of the policy year for which premiums shall have been paid. If this Policy continues beyond the last policy year for which values are shown in such table, values for such years shall be computed on the same basis as above provided and will be furnished upon request. The cash surrender values and paid-up nonforfeiture benefits available under this Policy are not less than the minimum values and benefits required by or pursuant to any applicable statute of the State in which the policy is delivered."

Both parties agree that it is initially necessary to determine the cash value of the policy at the time of default (November 24, 1960). Also, both agree that the cash value at the end of the first year of the policy (June 24, 1960) per $1,000 principal sum was minus nine dollars and five cents (—$9.05) and that to find the cash value on November 24, 1960, it is necessary to determine the cash value at the end of the second year and interpolate. They disagree, how-

ever, as to the proper cash value at the end of the second year.

The meaning of "cash value" here is not imprecise. The standard nonforfeiture provision of "The Insurance Company Law of 1921", Act of May 17, 1921, P. L. 682, §410A, as amended, 40 P.S. §510.1, states: "(b) Any cash surrender value available under the policy . . . shall be an amount not less than the excess, if any, of the present value on such anniversary of the future guaranteed benefits, which would have been provided for by the policy, including any existing paid-up additions, if there had been no default over the sum of (A): the then present value of the adjusted premiums as defined in subsection (d) corresponding to premiums which would have fallen due on and after such anniversary; and (B) the amount of any indebtedness to the company on the policy. . . .

. . .

"(e) Any cash surrender value and any paid-up non-forfeiture benefit, available under the policy in the event of default in a premium payment due at any time other than on the policy anniversary, shall be calculated with allowance for the lapse of time and the payment of fractional premiums beyond the beginning of the policy year in which the default occurs. . . ."

In accordance with these requirements and the "Basis of Cash Value" provision of the policy, the Company computed the cash value of the policy at the end of the second year as follows:

1. Add present value of future guaranteed benefits:
   a. Present value of unmatured coupons       $1055.70[1]

---

[1] All figures used are on the basis of the face amount of the policy proceeds—$10,000.

b.  Present value of return pre-
    miums                            642.10

c.  Present value of whole life
    benefits                        3964.90
                                    ————————
    Total present value of all
    policy benefits                 $5662.70

2.  Less present value of adjusted pre-
    miums                           5448.10
                                    ————————

3.  Cash value on June 24, 1961      214.60

The Company then made the required interpolation as follows:

1.  Cash value on June 24, 1961      214.60
2.  Less cash value on June 24, 1960  ($—90.50)
3.  Increase in cash value for year  305.10
4.  Increase in cash value for 5 months
    (5/12ths times $305.10)          127.13
5.  Cash value on November 24, 1960
    ($—90.50 plus $127.13)            36.63

To this figure the Company added the amount of $24.83, representing its determination of the November 24, 1960, value to be given to the first of the guaranteed coupons (i.e., the coupon's matured value of $59.60 times 5/12ths).[2] The total value of the policy on November 24, 1960, therefore was the thus obtained sum of $61.46 (which it rounded out to $61.50) less the indebtedness to the Company for the payment by it of the October 24, 1960, premium ($45.80) and for one month's interest thereon ($.20). The net cash value available on November 24, 1960, was determined to be $15.50 computed as follows:

_____

[2] In computing the cash value of unmatured coupons at the end of the second policy year (June 24, 1961), the Company excluded this first coupon and determined the present value only of the remaining 18 coupons.

| | | |
|---|---:|---:|
| Interpolated cash value on November 24, 1960 | | $36.63 |
| Plus: pro rata value of first coupon | | 24.83 |
| | | |
| Policy value on November 24, 1960 | | 61.46 |
| Rounded out | | 61.50 |
| Minus: October 24, 1960, premium loan | $45.80 | |
| Interest for one month | .20 | 46.00 |
| Net value of policy on November 24, 1960 | | $15.50 |

When the November 24, 1960, premium was not paid, the Company determined that the December 24, 1960, cash value was insufficient to provide an automatic premium loan for the premium. Therefore, in accordance with the policy provisions, it used the remaining $15.50 net value to purchase paid-up extended term insurance. The parties agree that if the above value is correct, the insurance so purchased would have expired on April 8, 1961.

Plaintiff disputes this computation. Her point of difference with the Company comes in the computation of the cash value at the end of the second policy year. Her computation is as follows:

1. Add present value of future guaranteed benefits:

| | | |
|---|---|---:|
| a. | Present value of unmatured coupons | $1117.40 |
| b. | Present value of return premiums | 642.10 |
| c. | Present value of whole life benefits | 3964.90 |
| | Total present value of all policy benefits | $5724.40 |

2. Less present value of adjusted premiums        5448.10

3. Cash value on June 24, 1961        $ 276.30

Plaintiff then made an interpolation as follows:

1. Cash value on June 24, 1961        $ 276.30
2. Less cash value on June 24, 1960        ($ -90.50)

3. Increase in cash value for one year        366.80
4. Increase in cash value for 5 months        152.50
   (5/12ths times $366.80)
5. Cash value on November 24, 1960        62.30
   (($ -90.50) plus $152.80)

Plaintiff then subtracted the indebtedness of $46.00 for the October 24, 1960, premium loan and arrived at a net value on November 24, 1960, of $16.30. This sum, the parties agree, would have purchased paid-up extended term insurance expiring on April 14, 1961, one day after Haut's death.

It is apparent, from a comparison of the parties' computations, that the sole point of dispute arises from the amount of present value attributable to the guaranteed coupons on June 24, 1961 (the end of the second policy year). Every other figure entering into the computation of the June 24, 1961, cash value is identical and the difference in cash value between the parties on this date is $61.70, the exact amount by which the values attributed to the coupons differ.

The explanation for this difference appears in the record. At the issue date of the policy, the parties agree, the present value of the nineteen unmatured coupons was $1044.30. This value is determined by application of an actuarial formula which is set forth in the record but not otherwise explained. At the end of the first policy year (June 24, 1960), the parties agree, these nineteen unmatured coupons had a value of $1080.10. This figure was determined by

taking the initial present coupon value of $1044.30 and adding to it a first year increment factor (for survivorship and interest) of .03426.[3]

At this point the parties part company. They agree that the increment figure for the second year is .03450. However, in computing the present value of unmatured coupons at the end of the second policy year (June 24, 1961), the Company treated the first coupon as matured (since it became due upon payment of the second annual premium in full—an event which would have occurred under Haut's method of payment on May 24, 1961), subtracted its matured value of $59.60 from the June 24, 1960, unmatured value of $1080.10 and multiplied the difference of $1020.50 by the .03450 factor. This resulted in a present value for eighteen unmatured coupons on June 24, 1961, of $1055.70. In its subsequent computations the Company gave credit for the first coupon by adding 5/12ths of $59.60 to the November 24, 1960, cash value.

Plaintiff contends this procedure is faulty. She says that treating the first coupon as matured is erroneous. In the words of plaintiff's actuarial witness: "I left that coupon in that factor 'Coupons' which since it had not matured (on November 24, 1960) it remained in that factor and was carried forward to the end of the second policy year."

Thus, plaintiff, in computing the present value of unmatured coupons at the end of the second policy year, simply took that value ($1080.10) found to be correct as of the end of the preceding policy year and added to it an increment based upon the above-mentioned .03450 factor. This produced a present value of $1117.40 for *nineteen* coupons on June 24, 1961. This method of computation, of course, made it unnecessary for plaintiff later to add any pro rata factor

---

[3] Throughout, resulting figures are rounded out.

for the first coupon to its interpolated (November 24, 1960) cash value since it had already taken that coupon into account.

As noted above, the difference in the June 24, 1961, cash values found by the parties is $61.70. As also has just been noted, this difference arises in the varying treatment of the coupons. Confirmation of what has been said and further narrowing the point of difference between the parties is the fact that if the matured value of the first coupon ($59.60) is multiplied by the increment factor (.03450), the resulting amount, when added to the base value of $59.60, produces a new value of $61.70, the exact amount of the difference. Put another way, to conform to the Company's method of computation, if the coupon value of $59.60 is increased to $61.70 by application of the increment factor and we take 5/12ths of this increased value and add it to the interpolated November 24, 1960, cash value computed by the Company ($36.63), we shall obtain the sum of $62.30, the November 24, 1960, value computed by plaintiff.

Thus, it seems clear that the specific point of contention is the proper treatment to be accorded the first coupon under the terms of the contract in determining the cash value of the policy at the end of the second policy year. We already have quoted plaintiff's actuarial expert to this effect. The Company's actuaries agreed; one answered in the affirmative to the following question: "Then the basic dispute . . . is whether the first guaranteed coupon in the face amount of $5.96 per thousand dollars of insurance, plus interest and survivorship at .03450, should have been added to the cash value as of the end of the second policy year?"

The other gave an identical answer to a similar question. And this issue may be more refined to the

determination of whether or not the first coupon should have been withdrawn from the "present value of coupons" before applying the second year increment factor. If it should not have been so withdrawn, then the value of the policy at the pertinent time would admittedly have been sufficient to continue it in force beyond the date of death. For reasons which we hereinafter explain, we rule against Company on this issue. And for an additional reason, not considered by the parties, we also rule that the value of the policy at the end of the second policy year was sufficient to continue it in force to the date of death, even assuming Company was correct in withdrawing the first coupon at the end of the first year in establishing the cash value of the policy at the end of the second year.

Company withdrew the first coupon from the present value of coupons at the end of the first year in establishing the second year's tabular cash value of the policy. The record is silent as to why this was done. Company's actuaries failed to explain it in their testimony at trial. Apparently, the tabular schedule set forth in the policy was computed on the assumption that premiums would be paid annually, or on their due dates. However, the premiums on the policy involved were paid monthly. If the second year premium had been paid in full on its due date (June 24, 1960), the coupon would have been paid for on said date and perhaps the withdrawal of this coupon would then have been proper, even if in fact it was not payable until June 24, 1961.[4] However, the second year premium

---

[4] The record fails to show the due date of the coupons. The excerpt in the record from the first coupon does provide "upon the payment of 2nd annual premium in full and not otherwise . . . the company will pay . . . $59.60." It is clear, therefore, that payment of the second annual payment in full was a condition to payment of the coupon. The record is also unclear as to whether or not the first coupon was paid for entirely out of the first year premium

was not paid in full on June 24, 1960, or at the time said coupon was withdrawn from the present value of the coupons. In fact, at most, only 1/12th of the second year premium was paid on this date. Charging monthly premiums on a policy containing tabular values set up on the assumption that premiums will be paid annually in advance rendered the policy ambiguous on the question of whether the first coupon should have been withdrawn from the present value of the coupons as of the first year. It may well be that such withdrawal is a sound actuarial practice, but this is not controlling. It is the policy which governs and if an ambiguity exists it must be resolved in favor of the insured. *Papadell v. Harleysville Mutual Casualty Co.*, 411 Pa. 214, 191 A. 2d 274 (1963).

But assuming Company was warranted under the contract in withdrawing the first coupon in the computation of present values of coupons, there is an additional reason why its determination of the cash value of the policy at the end of the second policy year cannot be sustained.

In establishing this value of the policy the Company interpolated the value of the first coupon ($59.60) between the first and second anniversary and included only 5/12ths of $59.60 or $24.83 in the computation of the policy's value as of November 24, 1960. As noted before, the policy is not clear as to whether or not the first coupon was paid for entirely out of the first

___

or whether two full year premiums had to be paid before the coupon would be entirely paid for.

The words "unmatured coupons" are also ambiguous when applied to the facts of this case. The word "unmatured", itself, has two different meanings—it could mean coupons neither earned nor due, or, it could mean, coupons earned or partly earned, but not yet due. Therefore, as of November 24, 1960, the coupon of $59.60 was "unmatured" in that it was partly earned on said date, while the remaining coupons were entirely unmatured.

year's premium or whether such was not effected until two full premiums were paid. Assuming the latter to be so, or that it would require 24 monthly premiums to pay for the coupon, then 17/24ths and not 5/12ths of the charge for said coupon was paid.[5] And under the terms of the policy "due allowance" must be given for the coupon. If the coupon was earned over a two year period from the date the policy was issued, why shouldn't 17/24ths of the "present claim" of the coupon ($59.60) or $42.16, instead of 5/12ths thereof, or $24.83 be the correct proration of the coupon?[6] Again the policy is at least ambiguous on this point. It may well be that the first year payments for the coupon were discounted in establishing the cash value at the end of the first year and hence a 5/12th proration was proper from an actuarial point of view, but again this is not the test. We are concerned with the terms of the contract itself and since an ambiguity exists therein, it must be resolved against the insurer.

Assuming however, that the coupon was earned and fully paid for by the first year's premium, then the withdrawal of said coupon from the present value of coupons would be proper and the coupon would not be entitled to the benefit of the second year increment. However, if this is so, the full $59.60 should have been included in establishing the cash value as of November 24, 1960, and not a mere fraction thereof, which again would give the policy at the end of the second year sufficient value to carry it beyond the date of death.

Company finally contends that regardless of the treatment accorded the first coupon in determining

---

[5] From the testimony, it appears each coupon was endowment insurance paid for by an additional charge on the premium.

[6] If the coupon were prorated at 17/24ths, the value of the policy would be of sufficient value at the end of the second year to carry it to the date of death.

the value of the policy at the end of the second year, the policy had still lapsed before death because, even under plaintiff's calculations, the net amount available on November 24, 1960, while sufficient to pay the premium due on that date under the Automatic Premium Loan provision, would still not be sufficient to carry the policy until the date of death. However, Company admittedly did not pay the premium due on November 24, 1960, by means of an automatic loan. Company took the position the policy lapsed as of that date and if Company made a mistake in failing to pay the premium which should have been paid by means of a loan, it will not, after the death of the insured, be permitted to change its position and take advantage of its own miscalculations. Company made an election and must abide by it.

In view of our conclusions set forth before, on the record presented plaintiff was entitled to recover on the policy as a matter of law and the judgment entered below must be sustained. Under the circumstances the Company's motion for a new trial need not be reached.

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE COHEN:

I agree completely with the majority's review of the factual background of this case, its carefully detailed explanation of the insurance policy involved and contrasting positions of the contending parties and its excellent analysis of the critical point of difference between the parties. In fact, were I to have written the opinion, I would not have changed a single word from the beginning through the sentence "The other gave an identical answer to a similar question" on page 242. Thereafter, I part company with the majority.

The majority advance several reasons for ruling against the Company. First, they say, no reason or

justification exists for the Company's "withdrawal" of the first coupon in determining the cash value of the policy at the end of the second year (June 24, 1961). They also indicate that the due date of the coupons is unclear and that there are ambiguities in the source of payment of the first coupon and in the meaning of "unmatured." I find no such problem.

The majority seem unable to conceptualize the matter of computing the cash value at the end of the second year (June 21, 1961). It is undisputed that such value at the end of the first year (June 24, 1960) was minus ninety dollars and fifty cents ($—90.50). This date having passed at the time of default, no one seems to have difficulty in understanding or accepting the computation. In computing cash value a year later, however, we must assume existence of a state of facts which never actually existed in the context of this policy (i.e. the actual arrival of June 24, 1961, while the policy was in force); and in so doing, we must make a computation based upon the situation which actually would have existed on June 24, 1961.

On that date, by the terms of the policy, the first coupon would have been a matured coupon. In fact, since the second annual premium would have been paid in full upon remittance of the monthly premium due May 24, 1961, this first coupon would have been a matured one for a month prior to June 24, 1961. While one may call anything "ambiguous" if he wishes to do so, such an appellation does not necessarily make it ambiguous. What difficulties the majority find in use of the word "unmatured" and in the monthly, rather than annual, payment of premiums elude me. A coupon is unmatured if, by its terms, it is not presently payable (i.e. it represents a future benefit); conversely, it is matured if it is presently payable. The monthly payment of premiums (a convenience to the policy-

holder, by the way, not to the company) does not create confusion in the table of annual cash values any more than a quarterly or semi-annual payment would. It means only that the payment of the annual premium *in full* will not occur as early as it would if the premium were paid only once a year. Thus, here, this payment in full occurred on May 24, 1961, when the twelfth monthly payment for the second year was made.

Clearly, therefore, the first coupon, which became due on May 24, 1961, would be a matured coupon by the time June 24, 1961, arrived, would no longer be a future benefit on June 24, 1961, and should not be included in computing the present (June 24, 1961) value of unmatured coupons on that date. It should be included for no more or no less than its matured value—$59.60. If this is done, the computation of cash value on June 24, 1961, would be as follows:

1. Add present value of future guaranteed benefits:
   a. Present value of unmatured coupons   $1055.70
   b. Present value of return premiums     642.10
   c. Present value of whole life benefits   3964.90

   Total present value of all policy benefits   $5662.70
2. Less present value of adjusted premiums   5448.10

3. Difference   $ 214.60
4. Add value of matured coupon   59.60

5. Total   $ 274.20

The interpolation is then made as follows:
1. Cash value on June 24, 1961   274.20
2. Less cash value on June 24, 1960   ($-90.50)

3. Increase in cash value for year        364.70

4. Increase in cash value for 5 months
(5/12ths times $364.70)        151.96

5. Cash value on November 24, 1960
($-90.50 plus $151.96)        61.46

This cash value on November 24, 1960 (rounded out to $61.50), is precisely the cash value obtained by the Company. After subtracting the indebtedness due it from the insured, we are left with the net policy value of $15.50, an amount which would have purchased term insurance only until April 8, 1961. All of this very clear procedure the majority ignores by resorting to use of the word "ambiguous" and misunderstanding the role of the first coupon.

Second, the majority attempt to inflate the pro rata value of the first coupon by attributing part of the first year's premium to it. Yet, the policy is clear that this is improper. The first coupon, by the terms of the policy, is payable only upon payment of the second annual premium in full. The amount of the coupon is $59.60. Each year thereafter, upon payment of the *annual* premium, another coupon for $59.60 matures. The first year's premium plays no part in the accrual of value in the first coupon; the second year's premium, like every succeeding year's, is wholly responsible for this: This fact also disposes of the majority's third contention that the entire $59.60 value of the first coupon might be includible in the November 24, 1960, cash value on the theory it was fully earned upon payment of the first year's premium. As we have shown, none of the value of this coupon was earned until commencement of payment of the second year's premium.

Finally, the majority reject the Company's argument that plaintiff cannot prevail even if her computation is accepted, but it does not explain fully what this

argument is. The Company contends that if one accepts plaintiff's computations, the conclusion is inescapable that there would have been sufficient cash value in the policy on December 24, 1960, to advance the payment of the full monthly premium due November 24, 1960, and that once this was done the remaining cash value on December 24, 1960, would have been insufficient to purchase term insurance for more than several days. Its reasoning is based upon accepting plaintiff's determination that the December 24, 1960, cash value would be $92.90 and upon interpreting the automatic premium loan clause in a certain way.

This clause, supra, *requires* the advancement of an automatic premium loan upon default in payment of a premium if the cash value of the policy at the end of the period for which the premium is to be advanced would be sufficiently in excess of the "total indebtedness" to the Company to cover the premium. On the computations of both parties here this determination was first made upon default in the payment of the premium due October 24, 1960; and both agreed that the indebtedness to the Company on November 24, 1960, would be $46.00 (the premium of $45.80 plus $.20 interest for the one month). Since this indebtedness of $46.00 was less than the November 24, 1960, cash value found by each party, both agree that this premium was properly advanced.

Upon default in payment of the November 24, 1960, premium, a similar determination was required by the automatic premium loan clause. The cash value a month later, according to plaintiff, would be $92.90. The indebtedness on that date, according to the Company, would be the above $46.00 plus another $.20 interest for that October 24, 1960, premium advance. The available cash value on December 24, 1960, therefore, would be $92.90 less $46.20 or $46.70. Since the

amount of the November 24, 1960, premium plus interest would be another $46.00, the available cash value would cover advancement of this premium with $.70 to spare. Therefore, it had to be advanced.

Plaintiff says this is wrong, that "indebtedness" means the premium amount plus interest to the next succeeding policy anniversary (June 24, 1961). If interest is so computed, the December 24, 1960, cash value would then be insufficient to provide a premium loan for the November 24, 1960, premium. Plaintiff contends this view is correct because the automatic premium loan provision goes on to say that the amount of an advanced premium with interest to the "next succeeding anniversary" of the policy shall constitute a loan against the policy and, therefore, an insured's indebtedness can only be computed at a given date by adding full interest to the next succeeding anniversary.

I disagree. The proximity of these two sentences in the premium loan provision should not becloud the fact that they speak of different things. It is the first sentence only that governs a determination of whether a premium loan must be made; and consistent with the proper view that all of the benefits of a life insurance policy should be preserved for an insured by making such a loan where possible, this sentence allows interest to be computed only to the end of the period for which the premium is being advanced. Thus, as plaintiff herself indicated in determining whether or not the October 24, 1960, premium could be advanced, interest should be computed only to November 24, 1960. In determining whether the November 24, 1960, premium should be advanced, interest should be computed to December 24, 1960. As the Company thus points out, plaintiff's calculations would require advancement of this November 24, 1960, premium and would leave insufficient cash value thereafter to purchase term insurance beyond the end of 1960.

The majority gives no reason for its position in rejecting this contention except to say the Company "made an election and must abide by it." I do not understand this conclusion. The policy either did or did not require an automatic premium loan to be made on November 24, 1960. If it did (i.e., plaintiff's computation being correct), no "election" by the Company is possible; the loan had to be made. Therefore, as the Company correctly notes, there remained insufficient cash value to purchase term insurance for more than a few days after December 24, 1960, on this basis. This is so clear that plaintiff did not advance this "election" argument before us, and I fail to see how the majority can reasonably do so.

Finding nothing in the majority's reasoning to support its decision, does one find such support elsewhere? The lower court did advance several points not mentioned by the majority.

In upholding its submission of the case to the jury and the jury's verdict for the plaintiff, the court below also determined that the policy provisions were ambiguous in not making clear the proper method of treatment of the first coupon. It found such ambiguity in the undefined phrase "due allowance" contained in the nonforfeiture clause of the policy; and, in accordance with the established rule that ambiguities in an insurance policy are to be construed against the insurer, *Papadell v. Harleysville Mutual Casualty Company*, 411 Pa. 214, 191 A. 2d 274 (1963), it determined that plaintiff's computation was equally as proper as the Company's and could be submitted and adopted.

Second, the lower court actually determined that the first coupon had not matured and, therefore, should have been included in the computation of cash surrender value and treated as a nonforfeiture benefit. This, it said, supports plaintiff's position.

Finally, as a practical justification for its decision, the court below pointed out that the Company's calculation of cash value as of November 24, 1960, gave the insured a gain of only forty cents in the value of the coupons for the five months period since the first policy anniversary. It came to this conclusion as follows:

Present value of coupons on June 24, 1960 $1080.10
Present value of coupons on June 24, 1961   1055.70

Decrease between 1st and 2nd years       $   24.40

Pro rata value of first coupon as of November 24, 1960 (rounded out)       $   24.80
Net increase as of November 24, 1960   $     .40

Since the cash value provision of the policy requires that the net value of coupon additions be not less than the amount used to purchase such additions and since, reasoned the court, the premium charge of five months for the coupons had to be more than forty cents, the Company's proration had to be incorrect.

In concluding, as it did, that the Company was giving the insured credit for only forty cents increase in coupon value between June 24, 1960, and November 24, 1960, the court made a fallacious computation. It first found the decrease in value of the unmatured coupons *for an entire year* and then added back only a five months prorated value for the matured coupon. This procedure naturally distorted the computation and produced a much lower increase than a proper computation would reveal. Moreover, it is not consistent with the Company's actual computation since the values of the unmatured coupons on the two dates (June 24, 1960 and June 24, 1961) each entered into the computations of the cash values on those dates and then into a single proportion to determine the November 24, 1960, cash value. Through this method the coupon values also

were prorated; and although the record is insufficiently clear regarding the basis of the actuarial computation of the present value of unmatured coupons, the following calculation would more closely resemble what the Company actually did regarding coupons:

| | |
|---|---:|
| Present value of 19 unmatured coupons on June 24, 1960 | $1080.10 |
| Present value of 18 unmatured coupons on June 24, 1961 | 1055.70 |
| Decrease in value of unmatured coupons | $ 24.40 |
| Decrease in value of unmatured coupons for five months (5/12ths of $24.40) | $- 10.17 |
| Add: Pro rata value of matured coupon on November 24, 1960 | 24.83 |
| Increase in coupons value between June 24, 1960 and November 24, 1960 | $ 14.66 |

Second, in concluding that the first coupon should have been treated as a nonforfeiture benefit and allowed in the calculation of cash surrender values because it was "not actually matured", the court engaged in a bit of illogic. This first coupon does play a role in the computation of cash values and does enter into the determination of the nonforfeiture benefit but not because it was unmatured at the time of default. The coupon enters into these items because both the policy and the State statute require such a result. The policy's cash value provision, supra, says that the excess of the life insurance benefits' present values over the adjusted premiums' present value is to be supplemented by the present value of any "coupon . . . additions" in determining the cash value at the end of any policy year. The statute, subsection (b), 40 P.S.

§510.1(b), supra, says the cash value shall include "any existing paid-up additions. . . ." Therefore, consideration of the first coupon as an element in determining cash value is required because the policy and statute so state, not because this coupon had not matured.

Finally, I find nothing ambiguous in the phrase "due allowance" appearing in the nonforfeiture provision of the policy. It is true that this provision does not further set forth an exact method of computing a "due allowance;" however, it is no more defective in that respect than the statute itself. Subsection (e), 40 P.S. §510.1(e), of the statute, supra, requires that "allowance" be given under circumstances like those present here; and we believe that, taken as a whole, the policy and statute provide ample procedures for determining what this means in any particular case.

In short, I find nothing here which supports plaintiff's position. I would reverse the order of the court below and direct the entry of judgment for the defendant Company.