JUNE H. MEIER, TRUSTEE, UNDER TRUST DATED NOVEMBER 25, 1978, AND NORDLING DEAN ELECTRIC COMPANY, INC., PLAINTIFFS-RESPONDENTS, v. NEW JERSEY LIFE INSURANCE COMPANY, DEFENDANT-APPELLANT.

Argued September 9, 1985—Decided February 3, 1986.

598

600

Laurence B. Orloff argued the cause for appellant (Orloff, Lowenbach, Stifelman & Siegel, attorneys; Laurence B. Orloff and Alan G. Trembulak, on the briefs).

Raymond J. Fleming argued the cause for respondents (Fuerstein, Sachs, Maitlin, Rosenstein & Fleming, attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

The issue in this appeal is whether a life insurance policy was in effect at the time of the insured's death. Plaintiff June H. Meier was the owner and a beneficiary of a life insurance policy insuring the life of her husband, Frank. The policy was issued by defendant-appellant New Jersey Life Insurance Company (NJL). Prior to Frank Meier's death, June Meier had attempted to surrender the policy. We must determine whether her attempts succeeded. Specifically, we must decide whether the policy was cancelled through NJL's failure to apply the policy's automatic premium loan provision (APL), through the surrender of the policy, or through the termination of the policy by mutual consent.

The trial court granted summary judgment in favor of plaintiffs-beneficiaries for the face amount of the policy and pre-

judgment interest.[1] A majority of the Appellate Division affirmed the trial court's judgment. Because of the dissent in the Appellate Division, defendant pursuant to Rule 2:2-1(a)(2) appealed as a matter of right to this Court. We affirm the judgment of the Appellate Division.[2]

I

In 1977 NJL issued two life insurance policies, No. 133624, the policy at issue, and No. 13331, each in the amount of $250,000, on the life of Frank Meier. These policies originally were owned by Mr. Meier but ownership was transferred to Mrs. Meier as trustee under a trust agreement dated November 25, 1978.

As trustee, Mrs. Meier was the substantial beneficiary of both policies.[3] Premium payments on each of these policies were due quarterly (February 11, May 11, August 11, and November 11). In each policy Frank Meier elected the automatic-premium-loan provision. The APL provision provides that if the insured misses a premium, NJL automatically pays the amount due out of the loan or cash value of the policy. In general, APL provisions are used to avoid policy defaults.

---

[1]The trial court dismissed the plaintiffs' claims for punitive damages and counsel fees. The dismissal was affirmed by the Appellate Division. These issues have not been raised on appeal.

[2]By Order dated November 15, 1984, the Court reserved decision on plaintiffs' motion to strike portions of defendant-appellant's brief filed with the Court, which allegedly raised issues outside the dissenting opinion in the Appellate Division. We deny plaintiffs' motion.

[3]Co-plaintiff-appellant Nordling Dean Electric Company, Inc., of which Frank Meier was an executive, also was a named beneficiary of Policy No. 133624 to the extent of its cash surrender value. Nordling was also named a collateral assignee of the policy as security for its advancement of premiums. After these payments were made to Nordling, the balance of the proceeds was payable to Mrs. Meier.

■ Until August 1980, Mr. Meier paid the premiums on both policies on time. Sometime in August 1980, however, Mr. Meier's insurance consultants advised him to replace the two NJL policies with policies of another company that had an equal face amount but a lower cost. Mr. Meier followed this advice and purchased two other life insurance policies.[4] Subsequently, Mr. Meier made no further premium payments to NJL on either policy.[5] NJL applied the APL provision in Policy No. 133624, the policy at issue, to pay the August 11, 1980, and December 11, 1980, premium payments. The next quarterly premium was due on February 11, 1981, and the end of the thirty-day grace period to pay this premium was March 14, 1981. There was sufficient cash value in the policy to use the APL to pay it.

Sometime in March 1981 June Meier, as the designated owner of the policy, commenced steps to surrender it for its cash value. On March 11, 1981, NJL received a notice from an

---

[4]Generally the mere substitution of one life insurance policy for another does not in itself effect a cancellation of the first policy. *See Northeast Ins. Co. v. Concord Gen. Mut. Ins. Co.,* 461 *A.*2d 1056, 1059 (Me.1983); *Providence Washington Ins. Co. v. Security Mut. Ins. Co.,* 35 *N.Y.*2d 583, 364 *N.Y.S.*2d 479, 324 *N.E.*2d 134 (Ct.App.N.Y.1974); *Milbank Mut. Ins. Co. v. State Farm Fire and Casualty Co.,* 294 *N.W.*2d 426 (S.D.1980).

[5]There was insufficient cash value in Policy No. 13331, Mrs. Meier's second policy, to cover the cost of the August 11, 1980, premium, and on October 10, 1980, NJL sent a letter to Mrs. Meier, as Trustee, advising her that Policy No. 13331 had lapsed. All parties agree that this second policy (Policy No. 13331) did in fact terminate before Mr. Meier's death. The remaining cash value in the second policy was automatically used to purchase reduced paid-up insurance in accordance with the nonforfeiture provision of the policy.

Reduced paid-up insurance is that insurance that the available cash value in a policy will purchase at a time when premiums are in default. Generally a reduced paid-up policy "is regarded merely as the original policy reduced to an amount corresponding to the premiums paid, that is, as a paid-up policy in the nature of a continuation of the old contract, at least so far as the stipulations thereof are applicable, rather than as a new and independent contract." 6 G. Couch, *Couch on Insurance,* 2d ¶ 32:137 (rev.ed.1985). A similar nonforfeiture provision was in Policy No. 133264 though NJL never sent Mrs. Meier a notice of lapse concerning this policy.

insurance agent, Sanford Feingold, dated March 9, 1981, which read: "Please be advised that the above captioned policy has been surrendered." In response to this message, NJL sent Mrs. Meier the following letter on March 13, 1981:

We regret to hear that you wish to terminate your policy.

Industry studies of the reasons why people give up policies point to the following causes:

1. The policyholder does not fully understand the valuable economic "tool" represented by the policy.

2. Temporarily, premium payments cannot be made because of unemployment, unusual medical expenses or some other economic set back.

3. The policy was originally "oversold".

4. A change in insurance needs.

The reaction of terminating a policy because of any of the above reasons is a costly one, and can be avoided by a careful reevaluation of the reasons why the policy was originally purchased and perhaps, adjusting the policy to suit ones [sic] current needs.

If after due consideration, *you still wish to surrender your policy, please complete the enclosed cash surrender form and return it to our office with the policy itself.* Upon receipt we will release the cash value to you promptly. (Emphasis added.)

Mrs. Meier returned the executed cash surrender form to NJL. The surrender form, which was back-dated to March 10, was actually executed by Mrs. Meier on March 24. NJL received it on March 26, 1981. The form reads as follows:

I HEREBY REQUEST THAT THE CASH SURRENDER VALUE OF POLICY NUMBER 133624, WHICH WAS ISSUED ON THE LIFE OF Frank Meier, BE PAID TO ME.

I CERTIFY THAT I AM LEGALLY COMPETENT TO EXECUTE THIS INSTRUMENT, THAT THIS CONTRACT IS NOT NOW ASSIGNED TO ANY PERSON OTHER THAN THE UNDERSIGNED, THAT NO PROCEEDINGS IN BANKRUPTCY OR INSOLVENCY INVOLVING THE UNDERSIGNED ARE NOW PENDING.

*I DO HEREBY RELEASE, SURRENDER, CANCEL, FULLY DISCHARGE AND TERMINATE SAID CONTRACT AT Denville, New Jersey,* THIS *10* DAY OF *MARCH,* 1981. (CITY) (STATE) (Emphasis added.)

On March 27, 1981, NJL acknowledged receipt of the "request to surrender," but asked that Mrs. Meier also return the policy. "As per contract provisions and as requested by recent letter, the policy itself must be returned prior to release of

surrender values." NJL also sent Mrs. Meier a Lost Policy Agreement in the event that she could not locate the policy.

NJL sent another letter on April 9, 1981, to Frank Meier, which said, "Please advise us when we may expect to receive a reply to the letter specified above, a copy of which is enclosed." This statement referred to the NJL letter of March 27, 1981.

Frank Meier died on April 13, 1981. In an internal memorandum, dated May 6, 1981, Joseph Fiore, and NJL Claims Manager, wrote the following:

Claim may be made for the full face amount of this policy ($250,000). This policy was paid to 2/81 and had sufficient value to process an APL. However, the policy holder requested surrender of the policy which caused the policy to be placed on RPU. *The insured died before surrender was effective.* (Emphasis added.)

According to another NJL document, this policy was placed on reduced paid-up status (RPU) on May 8, 1981, but made effective from February 1981.

The policy was never found. June Meier executed a Lost Policy Agreement on October 30, 1981, in conjunction with her claim for the face amount of the policy. NJL took the position that Policy No. 133624 had been placed on RPU status and in December 1983 tendered checks to Mrs. Meier and Nordling equal to the RPU value. NJL never sent Mrs. Meier a letter advising her that this first policy had been placed on reduced paid-up status, as it had done with respect to her second Policy, No. 13331.[6] This litigation followed.

Both the trial court and the Appellate Division held that prior to the insured's death the policy had not lapsed for nonpayment of the premium, nor had it been surrendered or terminated by mutual consent. The dissenting judge in the Appellate Division did not reach the issue of whether the policy was surrendered or terminated; he concluded that the policy had lapsed for nonpayment of premiums because based upon the communica-

---

[6]*See supra* at 604 n. 5.

tions it received, NJL properly did not apply the APL to the February 11, 1980, premium payment. We disagree.

## II

In determining whether prior to the insured's death the policy had lapsed for nonpayment of premiums, we must look first to the language of the insurance contract. Policy No. 133264 provides:

AUTOMATIC PREMIUM LOAN—If requested in the application for this policy or by written request filed at the Home Office before the end of the grace period, *any premium due and remaining unpaid will be paid automatically by a premium loan and will be subject to the Loan Provisions of this policy.* If the loan value is not sufficient to pay the entire amount of the premium due, the semi-annual or quarterly premium shall be paid automatically. If the loan value is not sufficient to pay the quarterly premium, no automatic premium loan shall be made and the premium shall remain in default. *This provision may be made ineffective at any time upon proper written request made to the Company at its Home Office.* (Emphasis added.)

It is undisputed that Frank Meier chose the APL provision; that a premium was due February 11, 1981; that the end of the grace period was March 14, 1981; and that there was sufficient cash value in the policy to pay the February 11 premium. Further, if the premium had been paid, unless otherwise terminated or surrendered, the policy would have remianed in effect on the date of the insured's death.

NJL agrees that it had an obligation to apply the APL provision to pay the February 11 premium.[7] However, because

---

[7]The District Court of Appeals of Florida has recognized that when an insured elects an automatic loan provision and fails to pay a premium, the insurer has a duty to pay the premium out of the accumulated dividends and the cash surrender value. *Massachusetts Mut. Life Ins. Co. v. Pinellas Cent. Bank & Trust Co.,* 175 *So.*2d 245, 248 (Fla.Dist.Ct.App.1965). *See* 45 C.J.S. Insurance § 623(d) (1946) (generally dividends, cash values, and in some instances loan values of life insurance policies should be used to pay a premium in default in order to prevent a forfeiture). The court further wrote that an insurer who failed to pay the premium and allowed the policy to lapse might be liable to the insured or his beneficiary. *Id.; cf. Northwestern Mut. Life Ins. Co. v. United States Nat. Bank of Omaha,* 267 *F.*2d 565 (8th Cir.1959) (insurer cannot forfeit life insurance policy for nonpayment of a premium

of the communications that it received—first the note from the insurance agent, Sanford Feingold, on March 11, 1981, and then the executed cash surrender form from Mrs. Meier on March 26, 1981—it argues that the owner effectively revoked the APL provision.

■ The policy provides that an APL provision "may be made ineffective at any time upon proper written request made to the company at its Home Office." There is no further explanation of what constitutes proper written request. The party asserting that the policy is cancelled has the burden of proof. *Joslin v. Hudson Cas. Ins. Co.*, 8 *N.J.Misc.* 195, 197 (1930) (burden on the defendant insurance company to prove that it had issued a policy to the plaintiff and that plaintiff had cancelled it); *Dill v. Lumbermen's Mut. Ins. Co.*, 213 *S.C.* 593, 50 *S.E.*2d 923, 926 (1948); 45 C.J.S. *Insurance* § 461 (1946).

■ The cryptic Feingold message ("Please be advised that the above captioned policy has been surrendered.") is insufficient to meet this burden. No proof was offered that Feingold was the insured's agent. An insurance agent's authority is determined by his rank and the scope of subject matter entrusted to him. 4 G. Couch, *Couch on Insurance* 2d ¶ 26A:66 (rev.ed.1984). In fact, while the record is unclear, it appears that Feingold was a general agent for NJL and, at most, merely a soliciting agent for Meier. Soliciting agents are authorized only to solicit and receive applications, accept premiums, and deliver policies. They have no authority, express or implied, to waive provisions of a contract. 4 G. Couch, *supra*, at § 26A:71. Moreover, there is no evidence as to who authorized Feingold to advise the company that the policy was surrendered.

A potentially more difficult question is whether Mrs. Meier's cash-surrender form constituted sufficient notice to NJL to

when it possesses a sufficient amount of dividends to cover the payment and the insured has not directed the insurer to use the dividends for another purpose).

revoke the APL. Although the surrender form was dated March 10, it was not mailed until March 24 and not received by NJL until March 26, twelve days after the expiration of the grace period.

 NJL relies on the fact that as a matter of internal procedure, it did not process APL's until fifteen days after the expiration of the grace period.[8] However, an insurer cannot use to its own advantage its failure to pay a premium under an APL provision on time. *Haut v. Franklin Life Ins. Co.*, 242 A. 2d 440 (Pa.1968). An insured cannot be penalized for an insurance company's internal procedures.

*N.J.S.A.* 17B:25–3 grants insureds the opportunity to pay their premiums with a low rate of interest within thirty days after the premiums are due. If the insured pays the premium within the grace period, the insurance company will not consider the policy to be in default. As one court has pointed out correctly under similar circumstances, "it would seem ... reasonable for the policy owner to expect that the APL would 'automatically' pay a 'premium due and remaining unpaid,' as required by the policy within the grace period." *Pack v. Progressive Life Ins. Co.*, 239 *Mo.App.* 1, 187 *S.W.*2d 501 (1945) (the existence of an APL kept a policy in full force and effect at the time of the insured's death despite the insured's failure to pay the premium.)

In *Board of Trustees of Unitarian Church v. Nationwide Ins. Co.*, 88 *N.J. Super.* 136, 140 (App.Div.1965), the defendant insurance company argued that one of the reasons that the life insurance policy at issue was in default was because of an overdue premium. The Appellate Division in an opinion written by Judge (later Justice) Sullivan found this argument to be of no significance since the policy included an APL provision and

---

[8]NJL did not notify Mrs. Meier of the use of the APL for payment of the August 11 and November 11 premiums until 43 days and 73 days respectively after the expiration of the grace period.

the cash value of the policy was adequate to pay the overdue premium. Other courts also have construed APL clauses to impose obligatory requirements on an insurance company to apply the premium loan prior to the expiration of the grace period. *Poe v. Penn Mut. Life Ins. Co.*, 32 *F.Supp.* 167 (D.Ark.1940); 6 G. Couch, *Couch on Insurance 2d* § 32:162 (rev.ed.1985).

Moreover, as a matter of policy it makes sense to adopt a rule to protect both the insured and the insurance company. By choosing APL provisions, insureds believe that they are obtaining automatic timely payment of premiums. When an insured dies sixteen days after the expiration of the grace period, his insurance company should not be able to claim successfully that the policy lapsed because its accounting department did not apply the APL until four days after his death. To allow insurance companies to determine by their own internal procedures when they will use an APL provision would create confusion for insureds and defeat the purpose of the provision.

Therefore, we hold that regardless of an insurance company's internal procedures, unless the company receives written notice that is in conformity with the insurance contract prior to expiration of the grace period, and provided that there is sufficient loan or cash value in the policy, it must use the APL to pay the unpaid premiums due no later than the last day of the grace period. If prior to the expiration of the grace period, however, the company does receive a timely proper written request to cancel either the APL provision or the policy, pursuant to the clear terms of the policy, it should not use the APL. We realize that this holding will penalize some insureds by having automatic premium loans applied to policies that they wish to cancel because, like Mrs. Meier, they will fail to provide the insurance company with timely and proper written notice. Nevertheless, this rule will offer fair protection to both insureds and insurance companies and provide both with clear-cut guidelines.

■ Here, since the company prior to the expiration of the grace period did not receive proper notice to revoke the APL provision, it was obligated to pay the February premium on or before March 14, the end of the grace period. Thus, the policy did not lapse due to nonpayment of the premiums.[9] Unless Mrs. Meier otherwise surrendered or terminated her policy, it remained in effect on the date of the insured's death.

### III

To determine whether an insured has surrendered coverage successfully, we must again look to the terms of the policy. In New Jersey, it has long been established that while insurance policies are contractual in nature, they are not ordinary contracts but contracts of adhesion between parties who are not equally situated. *Allen v. Metropolitan Life Ins. Co.*, 44 *N.J.* 294 (1965).[10] Courts apply the adhesion doctrine because of

---

[9]This holding is consistent with NJL's own interpretation of the contract. NJL never advised June Meier that the policy was in default or continued as reduced paid up insurance as it had done with her second policy (Policy No. 13331). *See supra* at 604 n.5. NJL did not take the position that the policy had lapsed because the owner had revoked the APL option and no premium was paid until well after Frank Meier's death in April. In short, NJL's actions subsequent to receipt of the agent's notice and the executed cash surrender form do not reflect that it had accepted them as a "proper written request" to make the APL provision ineffective.

[10]Contracts of adhesion offer only a take-it-or-leave-it proposition. The party seeking the service may either agree to complete adherence or reject the contract in total. There is no freedom to negotiate terms. E. Farnsworth, *Contracts* § 4.26 (1982). Generally, the person seeking insurance must sign a standardized agreement in order to procure insurance. In fact, the first use of the term "contract of adhesion" was in an article dealing with the formation of insurance contracts. Patterson, "The Delivery of a Life-Insurance Policy," 33 *Harv.L.Rev.* 198, 222 (1919), *cited in* Note, "A Common Law Alternative to the Doctrine of Reasonable Expectations in the Construction of Insurance Contracts," 57 *N.Y.U.L.Rev.* 1175 n.15 (1982).

Some courts apply the adhesion doctrine when evaluating insurance contracts because of the unequal bargaining strength of the parties. E. Young, J. Lewis and J. Lee, "Insurance Contract Interpretation: Issues and Trends" 1975 *Ins.L.J.* 71 (1975).

the unequal bargaining power of the parties. Insurance companies possess all the expertise and unilaterally prepare the varied and complex insurance policies. As Judge Learned Hand stated in *Gaunt v. John Hancock Mut. Life Ins. Co.*, 160 *F*.2d 599 (2d Cir.), *cert.* denied, 331 *U.S.* 849, 67 *S.Ct.* 1736, 91 *L.Ed.* 1858 (1947):

> A man must indeed read what he signs, and he is charged, if he does not; but insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion. [*Id.* at 602.]

In *Gaunt*, Judge Hand established the doctrine of reasonable expectations. Under this doctrine, courts will enforce only the restrictions and the terms in an insurance contract that are consistent with the objectively reasonable expectations of the average insured. *See Di Orio v. New Jersey Mfrs. Ins. Co.*, 79 *N.J.* 257, 269, 270 (1979). Professor Robert Keeton of Harvard Law School describes the doctrine as "a measure of judicial regulation of insurance contracts." "Insurance Contract Interpretation: Issues and Trends," 1975 *Ins. L.J.* 71, 74 (quoting "Insurance Lawyers View 'Wayfaring Fool' Doctrine," *Insurance Advocate* 21 (July 24, 1971).

Our courts have adopted the principle giving effect to the "objectively reasonable expectations" of the insured for the purpose of rendering a "fair interpretation" of the boundaries of insurance coverage. *Di Orio*, 79 *N.J.* at 269; *Allen v. Metropolitan Life Ins. Co.*, 44 *N.J.* at 305 (1965); *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 482–83 (1961). In *Kievit*, we stated:

> When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.'
>
> [*Id.* at 482.]

Application of this doctrine leads to a basic tenet of insurance law that in interpreting insurance contracts any ambiguities

should be construed against the insurer and in favor of the insured.[11] As we stated in *Allen,*

> The company is expert in its field and its varied and complex instruments are prepared by it unilaterally whereas the assured or prospective assured is a layman unversed in insurance provisions and practices. He justifiably places heavy reliance on the knowledge and good faith of the company and its representatives and they, in turn, are under correspondingly heavy responsibility to him. His reasonable expectations in the transaction may not justly be frustrated and courts have properly molded their governing interpretative principles with that uppermost in mind. Thus we have consistently construed policy terms strictly against the insurer and where several interpretations were permissible, we have chosen the one most favorable to the assured.
> [44 *N.J.* at 305.]

With the doctrine of reasonable expectations and this principle of construction in mind, we now examine the concept of surrender. Where the insured is given the right under a life insurance policy to surrender the policy and accept its cash surrender value, such right constitutes a continuing offer on the part of the insurance company that, when accepted by the insured, fixes the rights of the parties without further action on the part of the company. *See Board of Trustees of Unitarian Church v. Nationwide Ins. Co.,* 88 *N.J.Super.* at 139 (App.Div.1965). *Board of Trustees* is the leading New Jersey case in this area. There the key question, as framed by the Appellate Division, was "when is the option considered as having been accepted or exercised?" *Id.* A similar question is posed in this case.

In *Board of Trustees,* the insured decided to stop paying the premiums on his life insurance policy. *Id.* at 138. He informed the Church, as beneficiary, that it could continue the payments,

---

[11]One commentator notes as another reason to resolve the ambiguities in favor of the insured:

> The very nature and purpose of insurance, *i.e.,* the spreading of individual risks over the entire community, injects into the insurance contract an element of public interest not common to the ordinary contract which normally affects only the parties hereto.
> Note, "Insurance-Construction of Policy Terms," 1954 *Wis.L.Rev.* 335, 336 (1954).

convert the policy to paid-up insurance, or surrender the policy for its cash value. *Id.* The Church decided to surrender the policy. *Id.* Nationwide Insurance Company (Nationwide) sent the Church a surrender form that required the signatures of the insured and the beneficiary. *Id.* The policy provided, as in this case, that "the Policy must be returned to the company for surrender." *Id.*

The Church mailed the form to the insured and he signed it and sent it back to the Church. *Id.* The Church then signed the form and mailed the form and the policy to Nationwide on November 26. *Id.* Unbeknownest to either the Church or to Nationwide, the insured had died on November 17, 1962. *Id.* The Church then demanded the full face value of the policies. Nationwide refused the request and instead tendered only the cash surrender value of the policies. *Id.* at 139.

Nationwide's position was that the insured's signature on the surrender form constituted acceptance and thus fixed the party's rights and liabilities before his death. The Appellate Division disagreed. The court stated that "the policy provided that upon election to receive the cash surrender value, it had to be returned to the company for surrender." Therefore, *"an essential condition of the exercise of the option was the delivery of the policy to Nationwide."* *Id.* (emphasis added). The court concluded that the surrender of a policy after the insured's death was based on a mutual mistake of fact and therefore the surrender was not legally binding on the beneficiary. *Id.*

In the case before us, NJL and the dissent contend that Mrs. Meier effectively surrendered her policy when NJL received her signed cash-surrender form on March 26, 1981. NJL further argues that the physical delivery of the policy was necessary only as a condition precedent to its payment, not as a condition precedent to its surrender. Plaintiffs, however, argue that the surrender did not become effective because the terms of the

insurance contract required the physical delivery of the policy to NJL before the surrender was effective.

 The requirement of physical delivery is common in insurance surrender options. 6 G. Couch, *Couch on Insurance 2d* § 32:194 (rev.ed.1985).

> Although there is some contrary authority, it has been held in several cases that a policy provision requiring the surrender of the policy in order to obtain the cash surrender value is a condition, for failure to fulfill which before death, defeats the insured's request.

Annot. 15 *A.L.R.* 3d 1317, 1320 (1967); *see also Interstate Life & Accident Co. v. Jackson,* 71 *Ga.App.* 85, 30 *S.E.*2d 208 (1944) (insurer refused to cancel policy without delivery of policy; therefore policy was in effect when insured died); *Equitable Life Ins. Co. of Iowa v. Germantown,* 94 *F.*2d 898 (3d Cir.1938) (sending of written request for cash value without the policy did not complete surrender); *Franklin Life Ins. Co. v. Durham,* 351 *S.W.*2d 104 (Tex.Ct.App.1961) (announcement of intention by insured to cancel did not effect surrender where insurer instructed insurance company to execute release and he died first). This requirement is placed in the policy by the insurer for its own benefit. Thus, the insurer may waive its right to physical delivery. *Id.* at § 32:195. *But see Gram v. Mut. Life Ins. Co. of New York,* 300 *N.Y.* 375, 91 *N.E.*2d 307 (1950) (insured who attempts to surrender policy in manner not provided for in policy is not accepting insurer's continuing offer of surrender, but rather giving a counteroffer, which must be accepted by the insurer. If the policy's surrender provision is stated in terms of physical delivery, it is binding on the insured and will be strictly enforced). 17 G. Couch, *supra,* at ¶ 67:271; 45 C.J.S. *Insurance* § 458 (1946).

 Whether or not physical delivery of a policy is required to effectuate a complete surrender of the policy depends ultimately on the specific language in the contract.[12] In the policy

---

[12] A mere intention to abandon the policy without its physical surrender will not terminate the policy. 17 G. Couch, *supra* at ¶ 67:290 n. 5.

at issue, the only clauses that discuss surrender or termination are as follows:

CASH VALUE—The cash value of this policy at any time when there is no premium in default shall be as stated in the table of nonforfeiture values. *This policy may be surrendered for its cash surrender value.* If this policy is surrendered within sixty-two days after the date of premium default or if it is surrendered within thirty-one days after a policy anniversary while Extended Term Insurance or Paid-up Life Insurance is effective, the cash value of this policy shall not be less than the cash value as of the date of such premium default or as of such anniversary.

CASH SURRENDER VALUE—The Surrender value of this policy is the cash value less any indebtedness. *The surrender value will be paid by the company upon the owner's written request and surrender of this policy.* (Emphasis added.)

The NJL policy, therefore, does not state explicitly whether it requires the return of the policy as a condition precedent to payment or to surrender. The use of the conjunction "and" favors the plaintiffs' interpretation that the policy requires notice and return in order to surrender. Furthermore, the NJL policy calls the physical delivery a "surrender," and surrender has been defined as the physical delivery of policy in conjunction with a written request. Annot., *supra*, 15 *A.L.R.*3d 1317. However, there is no specific definition in the NJL policy of "surrender." The policy calls for a surrender but does not say how a policy can be effectively surrendered. Thus, we conclude that the NJL contract is ambiguous as to whether the physical delivery of the policy is a condition precedent to its effective surrender.

Accordingly, the ambiguous language must be construed against NJL. *Kievit v. Loyal Protective Life Ins. Co.*, *supra*, 34 *N.J.* at 475. If language is unclear as to precisely when termination occurs, it must be construed to keep the policy in force. *Id.* Moreover, NJL's own actions with respect to the policy are consistent with its belief that the physical delivery of

the policy was necessary before it was surrendered effectively.[13]

Specifically, NJL's actions before Mr. Meier's death did not treat the policy as surrendered. In its March 13 letter in which it sent a cash surrender form to Mrs. Meier, NJL stated:

> If after consideration *you still wish to surrender your policy,* please complete the enclosed cash surrender form *and* return it to your office *with the policy itself.* (Emphasis added.)

The reasonable expectation of any person who read this letter would have been that the policy was not surrendered, and to surrender the policy, the insured would have to return both the form and the policy. If Mr. Meier had died the day after receipt of this letter, would anyone argue that his beneficiary was not entitled to the full face values of the policies?

Moreover, upon receipt of the cash surrender form, a Policy Service Supervisor from NJL sent Frank Meier a letter acknowledging the receipt of the "request to surrender" and requesting "as per contract provisions" the policy itself before the "release of surrender values." At no time prior to Mr. Meier's death did NJL advise the insured that the contract was surrendered. Instead it refers to the Meier's request as merely that, "a request to surrender."

NJL's actions after Mr. Meier's death confirm that it did not consider the policy as surrendered prior to his death. NJL's Claims Manager, Joseph Fiore, did not think that at Mr. Meier's death, the surrender of the policy was effective. In accordance

---

13As stated in 4 G. Couch, *supra,* at ¶ 26:21 n.5:

> An insurance company is bound by the construction placed upon a provision of the policy by its agent provided the agent is acting within the scope of his actual or apparent authority; although a provision that no agent can change any of the terms of the policy by parole does not affect his power to bind the insurer by construction of doubtful language therein.

Some courts have relied on estoppel theory to hold an insurance company to its agent's interpretation. *Mutual Benefit Life Ins. Co. v. Bailey,* 55 *Del.* 215, 190 *A.*2d 757 (1963); *Mattia v. Northern Ins. Co.,* 35 *N.J.Super.* 503, 512–13 (App.Div.1955); *Atlas Life Ins. Co. v. Unger,* 198 *Okl.* 234, 177 *P.*2d 98 (1947); *Edwards v. Masonic Mut. Life Ass'n,* 86 *W.Va.* 339, 103 *S.E.* 454 (1920); *National Life & Accident Ins. Co. v. Lewis,* 81 *S.W.*2d 1039 (Ct.App.Tex.1935).

therewith, NJL marked the policy as "reduced paid up" and not as surrendered. It tendered the reduced paid-up amount and not the cash-surrender value to the beneficiaries. If the policy had been surrendered, NJL would have tendered the cash-surrender value and not placed the policy on RPU status. In addition, it never advised Mrs. Meier that it was placing the policy on RPU status because of nonpayment of premiums, as it did with her second policy (Policy No. 13331). These actions by NJL's own employees, clearly more experienced in reading insurance contracts than lay persons, confirm the conclusion that the contract language concerning surrender was unclear and ambiguous.

## IV

Finally, these facts also establish that there was no mutual consent between the parties to terminate the policy. Indeed, the principles applicable to surrender likewise apply to termination. The Appellate Division held that:

> While Frank and June Meier may have intended to terminate the policy they were thwarted in that intention by the requirement to return the policy or execute the lost policy agreements. Their efforts to find the policy before Frank Meier's death were unsuccessful. There was no mutual consent to terminate the policy.

We agree.

It is well-established that as a general rule neither the insurer nor the insured has any power to rescind, cancel, surrender or abandon a contract of insurance except by virtue of some statute, the terms of the contract, the mutual consent of the parties through an extraneous agreement, or a reserved power in the contract like that of unilateral cancellation. 17 G. Couch, *supra*, at ¶ 67:1. Here, no statute [14] or contract [15] terms

---

[14]*N.J.S.A.* 17:29C–1 provides only for rules and regulations to give notice to insureds of unilateral cancellation by insurers:

17:29C–1. Policy provision; written notice

In addition to the powers conferred upon him by any other law, the Commissioner of Banking and Insurance is hereby authorized and empow-

directly addressed termination by insureds. Since we have determined that the plaintiffs were not in default for nonpayment of premiums, neither party was in breach. The dissent argues that Mrs. Meier's actions were sufficient to unilaterally cancel the insurance contract. It is well-established that the right of an insured to cancel an insurance policy unilaterally must be determined from the terms of the contract. 17 G. Couch, *supra* at ¶ 67:44. Here, there is no provision in the contract that provides for unilateral cancellation of the contract by the insured.[16] Therefore, the termination of the policy could arise only through the mutual consent of the parties.

The elements of a contract must be present in order to establish a policy termination by mutual consent, *id.* at § 67:205, and the party alleging that a cancellation has occurred, in this case the defendants, has the burden of proof. *Joslin v. Hudson Cas. Ins. Co.*, 8 *N.J.Misc.* 195, 197 (1930); *Dill v. Lumbermen's Mut. Ins. Co.*, 213 *S.C.* 593, 50 *S.E.*2d 923, 926 (1948).

There must be a meeting of minds, or mutual assent, to constitute a valid termination, *Pennsylvania Mut. Life Ins. Co. v. Ashton*, 93 *F.*2d 565 (10th Cir.1937); *Merchant & Bankers*

---

ered to direct, by rule or regulation as hereinafter provided, that insurance companies organized under the laws of this State or organized to do business in this State, shall include provisions in policies of insurance written by any such company in this State, whereby 30 days' written notice shall be given; (1) to the insured, of the cancellation of any such policy; and, (2) to any designated mortgagee not named therein as the insured of the cancellation of any interest in such policy; and, (3) to the insured, of intent not to renew any such policy. *L.* 1968, *c.* 131, § 1, eff. July 3, 1968. A similar Rhode Island regulation was held not to apply when an insured initiated the termination of his insurance. *Liguori v. Aetna Cas. & Sur. Co.*, 119 *R.I.* 875, 384 *A.*2d 308 (1978).

15The only provisions in the policy are those concerning cash surrender values, reprinted *supra* at 616.

16Defendant properly did not allege that the plaintiffs unilaterally cancelled the policy.

*Guaranty Co. v. Downs,* 128 *Fla.* 767, 175 *So.* 704, 711 (1937), and each party must act with knowledge of the material facts, *Pennsylvania Mut. Life Ins. Co.,* 93 *F.*2d at 568; 17 G. Couch, *supra,* at ¶ 67:205.

Incomplete negotiations do not effect a cancellation. *Dill v. Lumbermen's Mut. Ins. Co.,* 50 *S.E.*2d 923; 45 C.J.S. *Insurance* § 444. Thus a mere proposal by the insured to cancel his policy is insufficient unless it is accepted by the company, and a mere offer by the insurance company to return the premium will not effect a cancellation unless there is an acceptance by the insured. *McCollum v. New York Mut. Life Ins. Co.,* 8 *N.Y.S.* 249 (Sup.Ct.1889).

In the absence of an express contrary provision in the contract, an agreement for the mutual termination of a contract of insurance may be made in any form. 17 G. Couch, *supra,* at ¶ 67:205. The agreement need not be in writing, and no set form of words is necessary. *Id.* at § 67:209. Similarly, since a termination by mutual consent is based upon the parties' intent, it is immaterial whether that intent is manifested by words or by conduct. *Id.* at § 67:210.

In harmony with the general principles of contract law, the mutual termination agreement can be made dependent upon a condition. If that condition is not satisfied, it necessarily follows that no termination occurs and the policy continues in force. *Id.* at § 67:216. The parties may make the surrender of the policy a condition precedent to termination. *Id.* at ¶ 67:220. Where the agreement is subject to one or more conditions, it is necessary that all such conditions be satisfied. *Id.* If accepted only in part, the conditions are not satisfied and there is no mutual consent.[17]

---

[17]Where the insured requests immediate cancellation and the insurer responds with a list of conditions precedent, the insurance contract has not been cancelled. *Atlantic Am. Life Ins. Co. v. Huddle House,* 143 *Ga.App.* 52, 237 *S.E.*

 A policy provision that provides for the termination of an insurance contract should be explicit. Here the policy contained no provision advising the insured how he could terminate. From the provisions in the policy on "surrender" and the communications of the insurance company, it is reasonable to conclude that the requirements for termination were the same as those for surrender, namely, written notice and physical delivery of the policy.[18]

 Mrs. Meier wished to terminate the policy. However, she was advised by the insurance company that in order to do so, she had to deliver to the insurance company either the physical policy or a lost policy form. Based upon this request, she proceeded to look for the policy without success. Since she never returned the policy or a lost policy form, she did not fulfill the conditions for termination that NJL imposed. Accordingly, there was no meeting of the minds, and as a matter of well-recognized contract and insurance principles there was no termination of the contract by mutual consent. The policy was in effect at the time of Frank Meier's death.

---

2d 520 (1977) (life insurance policy that did not have a cancellation provision must be cancelled by mutual agreement).

[18]In *American Liberty Ins. Co. v. Park*, 48 *Ala.App.* 630, 266 *So.*2d 887, *cert.* denied, 289 *Ala.* 739, 266 *So.*2d 891 (1972), a fire insurance policy provided that it "shall be cancelled at any time at the request of the insured ..." *Id.* at 889. The insured, however, was advised by the insured's agent that the policy would have to be physically surrendered before the policy could be cancelled. The insured advised the agent he would bring in the policy as soon as he had time. A fire occurred before the insured delivered the policy. The court held that the policy was not cancelled. It reasoned that:

> The new cancellation procedure was proposed [by the company] and said proposal was communicated to the insured, Pack, orally and was by the insured accepted in the terms proposed to him, for he agreed to the new cancellation procedure when he informed appellant's agent that he, in effect, accepted the cancellation procedure insisted upon by the insurer's agent and would bring in the policy for cancellation when he had time to do so.

*Id.* at 890.

Because of the complexity of insurance contracts and the expertise of insurance companies, it is the obligation of those companies to draft clear and unambiguous contracts. In their policies, insurance companies should set forth precisely how an insured may effectively terminate, surrender or cancel his policy. In this case, failure to have done so adversely affected the insurance company; in other situations the insured may be the injured party. We think more precise draftmanship will benefit both insureds and insurers.

V

The Appellate Division held that the trial court properly allowed the plaintiffs to recover prejudgment interest. The law in New Jersey has long been that prejudgment interest may run on liquidated damages, not as a matter of right, but in accordance with equitable principles. *Manning Eng'r Inc. v. Hudson County Park Comm'n,* 71 *N.J.* 145, 159 (1976); *Bak-A-Lun Corp. v. Alcoa Bldg. Prods.,* 69 *N.J.* 123, 131 (1976); *Deerhurst Estates v. Meadows Homes Inc.,* 64 *N.J. Super.* 134, 155 (App.Div.1960), *certif.* denied, 34 *N.J.* 66 (1961); Pressler, Current N.J. Court Rules, Comment *R.* 4:42–11 (1985). In this case, the amount due is a liquidated claim of $250,000. It is of no import that the defendant in good faith did not pay the policy proceeds to the plaintiffs. NJL had the use of the policy proceeds during the course of this litigation, depriving the plaintiffs of the money to which they were entitled. We find that prejudgment interest was properly awarded.

VI

In conclusion, we hold that Policy No. 133624 was in effect at the time of Frank Meier's death. In reaching this decision, we find that NJL should have applied the APL provisions to pay the February 11 premium prior to the expiration of the grace period. Moreover, we find the language of the policy regarding surrender and termination to be ambiguous. This determina-

tion is based on not only our reading of the policy terms but also the actions of NJL with respect to the policy. Accordingly, we find that prior to the insured's death, the policy was not effectively surrendered or terminated by mutual consent. We also find that prejudgment interest was properly awarded. We therefore affirm the judgment of the Appellate Division.

CLIFFORD, J., dissenting.

The Court has not done anything really cataclysmic in this case. I mean, it has not turned insurance law upside down or anything like that. So the damage inflicted by today's decision is minimal (I greet it with greater serenity, probably, than will the defendant insurance company, to whom an adverse judgment of $256,133.05 plus $59,619.35 in pre-judgment interest may not be viewed as "minimal"). But it seems to me that my colleagues have gone out of their way to reach the wrong result. The strain shows. I therefore file this little dissent.

I

The Court first holds that the policy in question "did not lapse due to nonpayment of the premiums," *ante* at 611 (footnote omitted), and that "[u]nless [the owner] otherwise surrendered or terminated her policy, it remained in effect on the date of the insured's death." *Ante* at 611. I agree with those propositions.

The majority then decides that to the extent that the policy language deals with "surrender," the language is ambiguous, wherefore we must look to the conduct of the parties to determine whether this policy had been surrendered or terminated. Although I would not characterize the policy language touching surrender as "ambiguous" so much as non-existent (the policy contains no definition of "surrender" and speaks only of "cash surrender value"), I nevertheless agree with the Court that what really controls here, what is most revealing of the parties' intent, is the conduct of the insured, of the policy

owner, June Meier, and of the defendant company, New Jersey Life Insurance Company (NJL). On that score the majority concludes that NJL's actions confirm that it did not consider the policy as having been surrendered, *ante* at 617; and as against the contention that the policy was terminated, the Court says:

Since [the owner] never returned the policy or a lost policy form, she did not fulfill the conditions for termination that NJL imposed. Accordingly, there was no meeting of the minds, and as a matter of well-recognized contract and insurance principles there was no termination of the contract by mutual consent. The policy was in effect at the time of Frank Meier's death. [*Ante* at 621.]

With those critical conclusions as to surrender and termination of the policy, I do not at all agree.

## II

The background facts put the parties' conduct in perspective. I consider the following to be the essential facts.

1. The policy in question, issued by NJL on the life of Frank Meier in the face amount of $250,000, was owned by the insured's wife, plaintiff June Meier.

2. The policy contained an automatic premium loan (APL) provision, under which loans were automatically processed in the amount of unpaid premiums and the owner was notified of the "draw-down" in the policy's value.

3. Premium payments came due each quarter. For 1980 those payments were due on February 11, May 11, August 11, and November 11. As of August 11, 1980, the premiums had been paid and the policy was in full force and effect.

4. Commencing with the premium payment due on August 11, 1980, NJL received no further premium payments. The explanation for this is clear: Meier's insurance consultants, who rendered estate planning services and had in fact sold and serviced the NJL policies, recommended that those policies be replaced by policies of equal face amount but at lower cost; hence, on August 11, 1980, the premium-due date of the NJL

policies, Meier became insured by Executive Life Insurance Company of New York in the amount of $250,000 (which was paid, of course, after Meier's death). Significant in this regard is the reminder to Meier from his insurance consultants, on November 6, 1980, to "be sure that payments to New Jersey Life for [the subject policy] are discontinued." In consequence of the foregoing conscious business decision, the premiums due on August 11 and November 11, 1980, were not paid by the owner of the policy but *were* paid by operation of the APL provision. The owner was notified of these transactions, each of which drew down the value of the policy to the extent of about $3500.

5. It is apparent that the insured and the policy owner became concerned, if not alarmed, by the continuing use of cash values to pay premiums on a policy that they had already replaced with an Executive Life policy affording the same dollar amount of coverage. The record does not inform us precisely when precisely who said precisely what to precisely whom; but on March 11, 1981, before the 31-day grace period for payment of the February 11, 1981, quarterly premium had expired, NJL received a one-sentence letter, dated March 9, 1981, from Sanford Feingold Agency, informing the company that the policy in question "had been surrendered." (The Court labels this message as "cryptic," *ante* at 608. There is nothing cryptic about it—it is unmistakably clear—but as everyone agrees, it surely fails if its intention was to effect surrender as of the date it was received.)

6. On March 13, 1981, NJL sent a form letter, together with a cash-surrender form, to the policy owner, urging her to reconsider her intention, expressed in the March 9 communication from Sanford Feingold Agency, to terminate the policy. The form letter reads, in pertinent part, as follows:

If after due consideration you still wish to surrender your policy, please complete the enclosed cash surrender form and return it to our office with the policy itself. Upon receipt we will release the cash value to you promptly.

7. The cash-surrender form accompanying the form letter, completed and signed by June Meier, was received by NJL on March 26, 1981. That form, obviously backdated to March 10, 1981 (within the grace period for the February 11 premium), or completed on a different copy somehow obtained by the owner, was sent to NJL by the same Sanford Feingold Agency with the request that the "signed request for cash surrender value" be "process[ed] as quickly as possible." The cash-surrender form reads, in full:

> I hereby request that the cash surrender value of policy number 133624, which was issued on the life of Frank Meier, be paid to me.
>
> I certify that I am legally competent to execute this instrument, that this contract is not now assigned to any person other than the undersigned, that no proceedings in bankruptcy or insolvency involving the undersigned are now pending.
>
> I do hereby release, surrender, cancel, fully discharge and terminate said contract at Denville, New Jersey, this 10 day of March, 1981.

8. NJL thereupon, on March 27, 1981, acknowledged receipt of the "request to surrender" the policy. It also told the insured that before the "surrender values" could be released, the policy itself would have to be returned to the company or a lost policy agreement executed and returned. "Upon receipt of either the policy or the form, all values will be released promptly."

9. Before the policy was located or the lost policy agreement signed and returned, Frank Meier died on April 13, 1981, eighteen days *after* NJL had received the form executed by June Meier by which she did "release, surrender, cancel, fully discharge and terminate" the subject policy.

### III

From the facts recited above I would conclude that the rights of the parties were fixed as of March 26, 1981, the date NJL received the cash-surrender form executed by the policy owner. By the terms of that document June Meier unequivocally relin-

quished all further interest in and rights under the policy, in consideration of the cash surrender value.

As the Court correctly observes,

[w]here the insured is given the right under a life-insurance policy to surrender the policy and accept its cash surrender value, such right constitutes a continuing offer on the part of the insurance company, which, when accepted by the insured, fixes the rights of the parties without further action on the part of the company.

[*Ante* at 613.]

Alas, despite this encouraging step on the right foot, the Court immediately stumbles in the briarpatch of "ambiguous policy language." Specifically, it declares that a policy that does not define "surrender" is "ambiguous as to whether the physical delivery of the policy is a condition precedent to its effective surrender." *Ante* at 616. And once the touchstone of ambiguity has been dredged up, the predictable conclusions snowball: construe the language (here, the non-language) against the perpetrator, construe it against surrender or termination, construe it to keep the policy in force, etc., etc., and *voila*, there you have it: physical delivery of the policy is a condition precedent to surrender—a proposition that the trial court correctly rejected out of hand.

In support of these manifestly dubious propositions the majority opinion hearkens back to NJL's March 13 letter (the "please reconsider" letter), and asks:

If Mr. Meier had died the day after receipt of this letter, would anyone argue that his beneficiary was not entitled to the full value of the policies?

[*Ante* at 617.]

Of course not. And nobody presumes to make any such contention. Its rejection by the Court is a no-weight make-weight.

But try it this way: if the insured had died the day after receipt, on March 26, of the "I release, surrender, cancel, fully discharge and terminate said contract" form, is there any doubt that his beneficiary was entitled to *nothing* under the policy and that the owner was entitled to exactly what she sought—the cash-surrender value? That is, in effect, this case.

Or, perhaps more to the point, this way: if the insured had not died and the company had continued, after March 26, to apply the APL to keep the policy in effect or otherwise reduce its value, would anyone contend that the insured was not entitled to the full cash-surrender value as of March 26? Surely not.

But to return to our reference point, ambiguity: what could be more *un*ambiguous than the executed release-surrender-termination-cancellation form? How more plainly could the owner express her earnest wish that the company cease depleting what was left of the policy's value by its continuing resort to the APL provision? How could her acceptance of what the Court concedes is NJL's ongoing offer be expressed more straightforwardly than it is on the executed form?

At that point—March 26, 1981—the rights of the parties were established. The owner had accepted the company's offer—and this *was* a matter of simple, basic offer-and-acceptance rather than, as the majority suggests in its mischaracterization of my position, unilateral cancellation of the insurance contract. NJL then told the policy owner that in fulfillment of her now-established right to the cash-surrender value, the policy or a lost policy agreement would have to be furnished—a classic example of a condition precedent to payment of a matured claim. No amount of after-the-event ineptness on the part of company personnel (of which there was plenty), short of something that would work a novation, could change the legal positions of the parties as they stood on March 26.

IV

For the foregoing propositions I have marshalled no authority, as the reader may have observed. I make the immodest assumption that so plain and common-sensical are those propositions that no authority is required. Not that the authorities do not exist—the briefs are crammed with them; but there is no need to resort to them for support of the conclusion that

when, as in this case, the owner of a policy gives unequivocal notice of surrender of a life-insurance policy, that notice is sufficient to constitute exercise *then and there* of the cash-surrender option, and physical delivery of the policy is no more than a condition precedent to payment of the cash-surrender value.

There is, however, one authority that should be rescued from the abusive treatment to which the majority subjects it. *Board of Trustees of Unitarian Church v. Nationwide Ins. Co.*, 88 *N.J.Super.* 136 (App.Div.1965), is relied on heavily, *ante* at 613–14, for the proposition that delivery of the policy is a condition precedent to surrender. First, we do not know what the policy language was in *Unitarian Church.* Second, the case is plainly distinguishable on its facts—and we are, after all, in an area characterized by exquisite fact-sensitivity—for in that case the insured died *before* the cash-surrender form and the policy had even been mailed to the company; the rights of the parties having been fixed as of the date of death, the insurance company was of course obligated to pay the face amount of the policy before receipt of the cash-surrender form and policy. Third, the decision was based on mutual mistake of fact, nowhere hinted at in this case. And fourth, the language relied on in *Unitarian Church* is pure dictum.

On a more agreeable note, however, I would add my voice to the majority's encouragement of "more precise draftsmanship" of insurance contracts, *ante* at 622. Indeed, of more precise articulation in general. I am all for that. Always have been. *See, e.g., 495 Corp. v. New Jersey Underwriting Ass'n*, 86 *N.J.* 159, 171 (1981) (concurring opinion) (the insurer should, through the use of its "perceptive and competent counsel * * * skilled in the craft of explicit expression," mold its policy forms to "accommodate * * * the realities of judicial interpretation"); *see also State v. Lee*, 96 *N.J.* 156, 167 (1984) (dissenting opinion) (bemoaning the "woeful lack of precision in our public discourse"); *Oakwood at Madison, Inc. v. Township of Madison*, 72 *N.J.* 481, 636–37 (1977) (concurring opinion) (quoting E.

Newman, *A Civil Tongue* 69 (1976) ("We are all safer when language is specific. It improves our chances of knowing what is going on.")). I would hasten to add, however, that even though a remarkable level of prescience on the insurer's part might have produced language in the policy that specifically addressed the situation here, thereby obviating the dispute, the absence of such language does not affect the right result. Given the Court's interpretation, however, the insurance company may be well advised to give the policy another look.

V

I would reverse the judgment of the Appellate Division and remand the cause to the trial court for entry of judgment in favor of defendant. If the parties are unable to agree on an adjustment of the premium to reflect coverage up to March 26, 1981, an issue nowhere addressed on this appeal, I would leave resolution of that question—a simple calculation—to the trial court.

*For Affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal and remandment*—Justice CLIFFORD—1.