<hr/>

747 A.2d 815

LILLISTON CHRYSLER PLYMOUTH DODGE TRUCK JEEP EAGLE, INC. AND LILLISTON FORD, INC., PLAINTIFFS–APPELLANTS, v. UNIVERSAL UNDERWRITERS GROUP, DEFENDANT–RESPONDENT, AND VINCENT DORSEY, EAGLE ACCEPTANCE CORPORATION, EAGLE FINANCIAL MANAGEMENT, INC., TALON ACCEPTANCE COMPANY, PRIME LENDING CORPORATION, GRANITE FUNDING I CORPORATION, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued February 24, 2000—Decided March 28, 2000.

Before Judges KING, PAUL G. LEVY and LEFELT.

*Richard E. Sandman,* argued the cause for appellants (*Hankin Sandson Sandman Bradley & Palladino,* attorneys; *John F. Palladino,* on the brief).

*Richard J. Albuquerque,* argued the cause for respondent (*Levine, Staller, Sklar, Chan Brodsky & Donnelly,* attorneys; *Mr. Albuquerque,* on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

This is an insurance claim by plaintiff Lilliston Chrysler Plymouth, an automobile dealer, under the extended theft provision of its policy with defendant Universal Underwriters Group (Universal). The dealer appeals from a summary judgment in favor of Universal on the ground that the dealer's alleged theft loss, as a matter of law, was not a covered event under the policy. We disagree and reverse. We conclude that the dealer presented a case for consideration by the trier-of-fact under the inventory-theft coverage provision of the policy.

On July 17, 1997 plaintiff Lilliston filed a complaint and a jury trial demand against Universal; Vincent Dorsey; four corporations operated by Dorsey: Eagle Acceptance Corporation, Eagle Financial Management, Inc., Talon Acceptance Company and Prime Lending Corporation; and Granite Funding I Corporation. Lilliston dismissed this action as to Dorsey and his corporations because of service of process difficulties and their destitute status. Lilliston took a default judgment against Granite, which later went into Chapter 11. This case then boiled down to the coverage claim by Lilliston against Universal. On cross-motions for summary judgment, Universal prevailed.

Lilliston's claim was based on the "Extended Theft" section (1)(d) provision of its Unicover policy with Universal, specifically the AUTO INVENTORY coverage feature. The applicable coverage clause states in pertinent part:

"EXTENDED THEFT" means:

(1) YOUR voluntarily parting with evidence of title to or possession of a COV-ERED AUTO when induced by:

* * * * *

(d) any other criminal scheme, criminal trick or criminal device which induces YOU, at that time, to part with evidence of title to or possession of the COVERED AUTO.

Lilliston contended it was induced to part with two vehicles and their titles by a criminal scheme, trick or device perpetrated by Dorsey.

Many of the pertinent facts are contained in a certification by Robert Ternay, Lilliston's controller. Plaintiff had been using Dorsey to procure financing for "high risk" loans for about a year before the 1996 Elliot and Loatman transactions on which these claims are based. On March 27, 1996 plaintiff sold a vehicle to Loatman for $20,557 with financing for $19,249.96. On May 8, 1996 plaintiff sold a vehicle to Elliot for $22,821.50 with financing of $22,000.01. Both of these loans were "high risk." On both of these transactions, Dorsey "shopped" the financing to Granite.

After Dorsey obtained the commitments for the loans from Granite, Elliot and Loatman made initial payments on their vehicles to Lilliston directly until the paper work was completed and the payment booklets were forwarded. Lilliston then sent these initial payments, which it had received on the loans, to the financing entity, here Granite. That entity in turn, as was customary, sent a check to Dorsey for the balance of the purchase price of the financed vehicles, which included the commission for Dorsey's services. Customarily, Dorsey would remit a check to Lilliston for the net cost of the vehicle after deducting his commission. Presumably, the installment sales contracts and the titles were ultimately assigned to Granite, the financier of the vehicles, through Dorsey. There is no irregularity claimed in this respect as to these transactions. The purchasers now are driving their cars and making regular payments, apparently to Granite's representative in bankruptcy reorganization. The problem is that the money sent to Dorsey disappeared. He pocketed the money from

Granite and never sent the proper sums to Lilliston. This default by Dorsey is the basis for the extended theft claim of $41,149.97 plus interest, pressed here by the plaintiff dealer.

Dorsey pled guilty on October 6, 1997 to the crime of theft and is currently on probation, making only nominal restitution. Plaintiff did not obtain a transcript of Dorsey's guilty plea, *R.* 3:9–2 (defendant must satisfy court of factual basis of a plea), or his sentencing. Nor did plaintiff take Dorsey's deposition. Thus the facts are rather skeletal as to Dorsey's precise thoughts or activities during this imbroglio. However, his larcenous conduct appears beyond cavil. According to Controller Ternay's certification, "in the months that preceded the Elliot and Loatman loans, Dorsey began remitting funds from other loans to us later and later. I believe at this point he was, at the very least, 'floating' the monies he received from the financing companies." Ternay says: "After not receiving payments from Dorsey on the Elliot or Loatman loans for an unusual period of time we followed up with the financing companies and discovered that they had written checks to Dorsey which he had cashed and not remitted to us." This information prompted the institution of the criminal charges to which Dorsey pled guilty.

■ Universal contended on the motion for summary judgment and on this appeal that

> [a]s a matter of law, the Extended Theft coverage provision does not provide indemnity for Lilliston's loss because there is not a scintilla of evidence in the record that any criminal scheme, trick, or device was perpetrated *at the time* Plaintiffs parted with title to or possession of the Vehicles. The award of Summary Judgment by the trial court was appropriate.

> [emphasis supplied.]

Universal claims the contemporaneous nature of the scheme, trick or device "at the time" is critical to the coverage and is lacking here. The Law Division judge agreed and said:

> So I don't see that there is coverage because the facts—the factual scenario cannot establish that at the time they parted with title they were induced to do so by virtue of a criminal trick or scheme or device, so that there's no coverage.

We do not find the matter so clear-cut. Despite the skimpy record, we conclude that a reasonable trier-of-fact might find, depending on the nuances of the testimony, that at the time these transactions were undertaken and finalized, Dorsey was or had been engaged in a "criminal scheme, criminal trick or criminal device" to induce plaintiff to part with the titles to Granite, the vehicles to the two buyers, and ultimately, of course, the money to himself. This likelihood could be reinforced by anticipated testimony from Ternay that Dorsey was "remitting funds from other loans later and later," probably juggling his trust fund obligations and finally running out of funds in the course of an ongoing criminal enterprise. At the least, this potential scenario, if proven, would be sufficient to create a factual question as to Dorsey's intent to steal from Lilliston, at the time these transactions originated. Also, obviously Dorsey's scheme, criminal or otherwise, succeeded, no matter what the timing, because he obtained the money and Lilliston lost the cars and the titles.

This scenario establishes in our mind a prima facie case that Dorsey's scheme, trick or device could have induced Lilliston to part with the titles and the cars. If Universal contends that the failure to remit was a spontaneous after-thought by Dorsey, perhaps a result of a swift and unexpected economic demise, unrelated to the initial transactions, and not a criminal scheme, trick or device, this would be a matter of a factual rebuttal to the prima facie claim, which Universal must establish at trial. We also recognize that the dealer's inventory insurance policy in this context is intended to protect the dealer's inventory from fraudulent criminal predators, not to guarantee the credit of the dealer's customers or business associates. *See Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services, Inc.,* 138 *Ill.App.*3d 574, 577, 93 *Ill.Dec.* 71, 485 *N.E.*2d 1281, 1283 (1985) (under "False Pretense (Broad Form Trick and Device)" insuring agreement coverage was available where insured dealer defrauded by a series of bad checks returned for lack of sufficient funds because this was not an extension of credit).

█ Proof of intent is difficult, subjective and always a matter of inference. We conclude on this record that the motion judge put too much stress on a requirement that plaintiff must prove so precisely and objectively a contemporaneous "criminal intent" when the title and the cars actually were transferred in order to permit the case to go to a jury. The irregularity of these transactions and the history of delayed payments on earlier similar transactions are sufficient, if proved, to present a factual question on the criminal fraud coverage issue. A summary judgment motion should not ordinarily be granted when an action or defense requires determination of a state of mind or intent, such as claims of waiver, bad faith, fraud or duress. *See Shebar v. Sanyo Business Sys. Corp.*, 111 *N.J.* 276, 291, 544 *A.*2d 377 (1988); Pressler, *Current N.J. Court Rules*, comment on *R.* 4:46–2 (2000). The matter before us is not so "one-sided" as to establish an absence of coverage as a matter of law. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995).

█ Research by counsel and this court discloses no reported cases in any jurisdiction on this particular extended theft coverage clause (1)(d) in this context. Thus, we resort to general principles. As Justice Pollock said in *Longobardi v. Chubb Ins. Co. of N.J.*, 121 *N.J.* 530, 537, 582 *A.*2d 1257 (1990):

> We begin with an overview of the fundamental rules for interpreting insurance policies. As contracts of adhesion, such policies are subject to special rules of interpretation. *Meier v. New Jersey Life Ins. Co.*, 101 *N.J.* 597, 611, 503 *A.*2d 862 (1986). Thus, we have said that "policies should be construed liberally in [the insured's] favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.'" *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 482, 170 *A.*2d 22 (1961) (quoting *Danek v. Hommer*, 28 *N.J.Super.* 68, 76, 100 *A.*2d 198 (App.Div.1953), aff'd, 15 *N.J.* 573, 105 *A.*2d 677 (1954)). Notwithstanding that premise, the words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability. *Brynildsen v. Ambassador Ins. Co.*, 113 *N.J.Super.* 514, 518, 274 *A.*2d 327 (Law Div.1971); *see also Weedo v. Stone–E–Brick, Inc.*, 81 *N.J.* 233, 247, 405 *A.*2d 788 (1979) (ambiguity genuine if "phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage"). Although courts should construe insurance policies in favor of the insured, they "should not write for the insured a better

policy of insurance than the one purchased." *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 *N.J.* 517, 529, 562 *A.*2d 208 (1989).

Under these principles, we cannot preclude plaintiff by summary judgment from attempting to establish before the trier-of-fact that Dorsey by criminal scheme, trick or device induced Lilliston to part with the titles and the cars, and to steal its money. Any ambiguities or lack of clarity in the insurance contract, or in its application to particular circumstances, must be resolved against the insurance carrier and in accordance with the reasonable expectations of the insured. *Sparks v. St. Paul Ins. Co.*, 100 *N.J.* 325, 336, 495 *A.*2d 406 (1985). Of course, the risk of "interpretative doubts" is, in a particular circumstance, placed on the insurer and for sound economic reasons. *See Salem Group v. Oliver*, 248 *N.J.Super.* 265, 273, 590 *A.*2d 1194 (App.Div.1991), *aff'd o.b.*, 128 *N.J.* 1, 4, 607 *A.*2d 138 (1992). This principle is exemplified by *Rudolph v. Home Indem. Co.*, 138 *N.J.Super.* 125, 136, 350 *A.*2d 285 (Law Div.1975), where the court afforded coverage for "theft or larceny" under the family comprehensive policy where the vehicle and title had been obtained by use of a forged certified bank check. *See also Modern Sounds & Sys., Inc. v. Federated Mut. Ins. Co.*, 200 *Neb.* 46, 52, 262 *N.W.*2d 183, 187 (1978) ("We hold that in an automobile insurance policy providing coverage against theft, in which the term is not defined, the term 'theft' will be construed broadly to include a loss caused by any unlawful or wrongful taking of the insured vehicle with criminal intent.").

We specifically note that in this circumstance we do not pass on the efficacy of any exclusions in the plaintiff-dealer's policy.

Reversed.